COMMONWEALTH *vs.* ANGEL LUNA
(and nine companion cases[1]).

No. 97-P-1493.

Middlesex. October 8, 1998. - December 31, 1998.

Present: LAURENCE, KAPLAN, & RAPOZA, JJ.

*Evidence,* Illustrative exhibit, Alibi, Firearm, Cross-examination. *Practice, Criminal,* Exhibits, Cross-examination by prosecutor.

At the trial of indictments, the judge did not abuse her discretion in finding that a gun proffered as a facsimile of the weapon used in an assault was sufficiently similar to that weapon to be admissible in evidence [93-94], and the judge correctly refused to strike the exhibit where it was relevant to the allegations of the indictments [94]; further, where the nature of the exhibit was clear, the judge was not required to give the jury a limiting instruction [94], and the prosecutor's holding the exhibit for three minutes during closing argument did not, in the circumstances, give rise to any reversible error [94].

At the trial of indictments, the judge correctly allowed the prosecutor, upon proper foundation, to forcefully cross-examine the defendant on his asserted alibi, and the judge correctly instructed the jury on their use of inferences from the alibi testimony and on the Commonwealth's burden of proof. [94-97]

INDICTMENTS found and returned in the Superior Court Department on March 1, 1995.

The cases were tried before *Martha B. Sosman,* J.

*Sean T. Delaney* for Angel Luna.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Catherine K. Byrne,* Committee for Public Counsel Services, with him) for John Melo.

*Marian T. Ryan,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Angel Luna and John Melo were severally indicted

---

[1] Four of the companion cases are against Luna; the remaining five are against John Melo.

in Middlesex County for the crimes of armed assault in a dwelling, home invasion, mayhem, assault and battery by means of a dangerous weapon (two counts), and assault by means of a dangerous weapon, all committed on January 28, 1995. Joint trial of the defendants commenced on January 23, 1997. Luna moved at the close of the Commonwealth's case for a required finding on the mayhem count; the motion was allowed. The jury found Melo not guilty of the mayhem count. They found both defendants guilty of all the remaining charges.

On the present appeals, two main questions are raised — whether a gun, supposedly similar to the one used by Melo in his attack on one Stephen Hall, was rightly admitted as a Commonwealth's exhibit (the actual gun had not been recovered), and whether the Commonwealth was entitled to cross-examine Melo as it did in respect to his assertion of an alibi. We outline the case to provide background for these (and minor related) questions.

On the evening of January 27, 1995, James Cameron (aged twenty) gave a party in his apartment at 790 Broadway Street, Lowell. While two guests, Greg LeDuc and Miguel Pacheco, were engaged in conversation about a sixty-dollar debt, the defendant Angel Luna (aged twenty) interposed and asked LeDuc whether he had "a problem with his boy." LeDuc punched Luna in the face and knocked him to the floor; LeDuc jumped on him and they scrambled. Luna and some others left the apartment. Luna, incensed, struck violently at a couple of the doors. Perhaps fifteen minutes later, Luna returned looking for LeDuc (who was gone) and demanded of Cameron why he had let this happen. Cameron said he had nothing to do with it. Luna, still sore, again left with others, crashing another door on the way. Cameron then ended the party, asking all to leave except his friends Michael Dion, Stephen Hall, and Robert McCarthy.

Sometime after midnight, with Dion sleeping on the floor and the others playing music, there was a noise at the front door and two men entered. One was the defendant John Melo (as later identified) (aged twenty-two), the other Luna. Melo held a handgun in both outstretched hands, Luna a three-foot metal pipe. Threatening Cameron with the pipe, Luna said he had been jumped at the party. Hall spoke up that Cameron was not involved. At this, Melo struck Hall across the face with the butt of his gun. (The facsimile gun was received as an exhibit dur-

ing Hall's testimony to the event.) Badly hurt and bleeding, Hall fell to the floor. Cameron, sitting on the floor at the time, curled up and covered his face with an arm. McCarthy was sitting near Cameron. Cameron heard the sound of something hitting McCarthy's head hard, and felt McCarthy's body slumping against him. Luna was in front of McCarthy with pipe in hand.

Melo told Cameron to stand and show his face. Cameron did as ordered and saw Melo pointing his gun at him and Luna holding the pipe. Melo told Cameron to tell LeDuc when he saw him that he was dead. The pair left the apartment.

In the aftermath, Hall and McCarthy were taken to Saints Memorial Medical Center. Abbreviating the evidence, it can be said that their injuries were severe and persisted for some time.

To the police who arrived promptly at the apartment, Cameron gave descriptions of the intruders but, although he knew them both, he provided no names, and his descriptions were not accurate. In his testimony explaining his behavior, Cameron said he was scared at the time and confused in his mind (evidently about how he would want the whole episode to end in the way of accountability). A couple of days after first speaking to the police, Cameron described Melo in detail and selected his and Luna's pictures from a book of photographs. Hall similarly identified the two. Dion so identified Luna and made an in-court identification of Melo.

To turn to the defendants' attempts at exculpation: Luna took the stand and, conceding his humiliation and his anger at LeDuc, said that, becoming satisfied on his return to the apartment that LeDuc was not there and Cameron was not to blame, he was content to go home. He denied returning to the apartment yet another time. He was driven home by a friend. Luna's girlfriend, Olga Sousa, testified he arrived around midnight, about the start of a midnight television program, "The Martin Lawrence Comedy Show." Sousa tended to Luna's hurt lip; she said he took a shower, went to bed, and didn't leave the place that night.

Melo testified he knew Luna and Cameron. He said he was not with Luna or at Cameron's apartment during those evening or morning hours and had nothing to do with the beatings of Hall and McCarthy. Around 9 P.M. that night, he said, he went to a private club, the Portuguese-American Civil Legion, at which he was a regular attendant. (Melo was born in Portugal.) There he played pool with various people, putting up fifty cents

a game, and he drank a number of beers. He stayed there until past the 1:45 A.M. last call of the bartender. He walked home alone a distance of about three-quarters of a mile from the club. All at the house were asleep. He had a bite and dozed off on a couch. It was not until February 8, when he was arrested by the police, that he had any awareness of the events at Cameron's apartment eleven days earlier. When he learned the date of the affair, he said "Thank God, it was a Friday," for it enabled him to recall he was then at the club and thus clear of suspicion. (The question of any support for Melo's alibi arose upon his cross-examination.)

1. *Exhibit.* Before the start of trial, the Commonwealth moved for leave to enter as an exhibit a gun claimed to be similar to the gun wielded by Melo when he sideswiped Hall. The judge asked the prosecutor to forbear any display of the weapon during her opening speech and to go to sidebar before tendering it as an exhibit during trial. Called as a witness for the Commonwealth, Hall testified the gun he saw in Melo's hands was a handgun, seven inches long, of a clip-in or clip-at-bottom type, and the facsimile shown him, he said, was similar to Melo's gun except the handle of the facsimile was brown, the original's was black. Arguments about the exhibit having been heard and considered at sidebar, the judge admitted it.

Where for whatever reasons original items of physical evidence cannot be produced, substitutes similar to the originals have often been received as exhibits, in criminal as well as civil trials, to illustrate and corroborate testimony in which the originals figured: the admission of such simulacrums is well understood to rest in the discretion of the court. See, e.g., *Everson* v. *Casualty Co. of America*, 208 Mass. 214, 220-221 (1911); *Commonwealth* v. *Ellis*, 373 Mass. 1, 7 (1977) (gun); *Commonwealth* v. *Florentino*, 381 Mass. 193, 196-197 (1980) (gun); *Commonwealth* v. *Stewart*, 398 Mass. 535, 542 (1986) (gun); *Commonwealth* v. *Russell*, 2 Mass. App. Ct. 293, 297-298 (1974) (knife).

a. The defendants seemingly argued that the proffered gun was not shown to be similar or sufficiently similar to the actual to serve as a forensic substitute, but Hall's testimony appeared to the judge sufficient to support her preliminary finding that the substitute qualified as an exhibit, and she surely did not exceed her discretion in so ruling. There was some evidence that Hall had once characterized Melo's gun as a "revolver," and Cam-

eron had done the same, whereas it was, apparently, technically correct to describe the exhibit as a "semi-automatic." As the judge said, the fact that the triers of fact might take the variance in the testimony to affect the value to be given the exhibit did not argue against admitting the exhibit in the first place. Indeed, in the circumstances of the case, the proper names of the weapons, original and exhibit, were of small account; their respective sizes and weights in hand might matter when Melo's swiping attack on Hall was considered, but there was no showing of discrepancies in these features of the weapons so large as to put in question the admission of the exhibit.

b. There was some contention that the exhibit had lost point and become perhaps needlessly provocative when the mayhem count was dismissed as against Luna. However, the mayhem count against Melo remained in the case until the verdict. Further, although the judge and counsel first saw the gun as connected with the mayhem counts, it was or could be illustrative or corroborative of evidence under the other counts, notably those charging the use of the gun as a dangerous weapon. On this view, the judge declined, correctly, to strike the exhibit.

c. The defendants asked the judge to give a "limiting" instruction, meaning an instruction that the exhibit was an intended facsimile and not the real thing (see the short instruction to this effect in *Commonwealth* v. *Stewart*, 398 Mass. at 542 n.6). The judge saw no need for an instruction in the present case. That the exhibit was only a stand-in was stated repeatedly as the evidence went in over the course of the trial, and this could not have been lost on the jury.

d. Luna complains about the prosecutor's holding the exhibit in her hand for three minutes during her closing argument to the jury. Nothing flamboyant or even purposefully inciting is alleged. The idea that the jury might be befuddled or seduced by such a display seems to us farfetched, and a mistrial would have been quite out of order.

2. *Alibi.* As noted, Melo testified that he was delighted, just after his arrest on February 8, to learn that the crimes happened on the Friday, because during that night and early morning he was at the Portuguese-American club. His claimed elation in the circumstances suggested that he might have means beyond his own say-so of proving his presence there at the time.

Quite naturally the prosecution would go about testing the credibility of a defendant's assertion of alibi by figuring how he

would have behaved if he was telling the truth and was innocent, and comparing that picture with how he behaved in fact. A defendant would be expected to search out any person with whom he intersected that night in the hope that the person would have a positive remembrance and could be offered as a witness. Proper cross-examination of a defendant as to what in fact he had done in this direction must start by the prosecution's undertaking to show that it was likely such a person or persons existed and likely that the person would be available to the defendant if the defendant pursued him or her in good faith and with due diligence.[2] This is the required "foundation" spoken of in "missing witness" parlance to be built by the Commonwealth as a condition of inquiring about the defendant's behavior in tracking down this evidence supposedly favorable to himself. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 287 (1990). As to "availability," see *Commonwealth* v. *Franklin*, 366 Mass. 284, 293 (1974); *Commonwealth* v. *Melendez*, 12 Mass. App. Ct. 980, 981 (1981); *Commonwealth* v. *Graves*, 35 Mass. App. Ct. 76, 83 (1993).[3]

In the present case the foundational formula was satisfied in the person of the bartender at work that night, from whom Melo said he obtained drinks over a period of some five hours.[4] Another candidate as a witness was named by the defendant: he said one Juvenile Quadras may have been present at the club that Friday. But Melo conceded he had made no effort to pursue any leads at all.[5] The possibly available witnesses under the

---

[2]The showing could be made through the cross-examination of the defendant himself. See *Commonwealth* v. *Fredette*, 396 Mass. 455, 466 (1985); *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 515-516 (1992).

[3]"Availability does not necessarily mean proof of actual physical whereabouts. Otherwise, a defendant by fabricating the existence of a witness could always preclude [an adverse] comment [or instruction]. What is meant by availability is 'the likelihood that the party against whom the inference is to be drawn would be able to procure the missing witness'[s] physical presence in court.' " *Commonwealth* v. *Melendez*, 12 Mass. App. Ct. at 981, quoting from *Commonwealth* v. *Happnie*, 3 Mass. App. Ct. 193, 197 (1975).

[4]Defense counsel indicated at sidebar that he would not choose to call this bartender because he was under indictment and would not make a good witness for the defendant. This statement about the plight of the bartender was of course unsworn, and we do not know if it was made on personal knowledge. See a similar criticism in *Commonwealth* v. *Graves*, 35 Mass. App. Ct. at 84 n.9, 79 n.4. See also note 5, *infra*.

[5]It was open to the defendant to avoid an adverse inference from his failure

formula included the two persons mentioned but also the limited, coherent ring of about fifteen persons (as roughly estimated by the defendant), members of the club or others who, according to the defendant, attended that evening and with whom, or with some of whom, Melo said he drank, played pool, and made bets. Cf. *Grady* v. *Collins Transp. Co.*, 341 Mass. 502, 506 (1960); *Commonwealth* v. *Fredette*, 396 Mass. 455, 466 (1985); *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 516 (1992); *Commonwealth* v. *Graves*, 35 Mass. App. Ct. at 83. Melo said he could not name these persons, but that would be a weak excuse for his not trying to find them if they existed as more than a fabrication.[6] Such inaction or indifference was particularly indicative of falsehood when, first, the evidence of guilt against Melo was quite strong and he would be powerfully motivated to prove his alibi if it was truthful, see *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 222-223 (1942); *Commonwealth* v. *Niziolek*, 380 Mass. 513, 519 (1980); second, as a regular at the club, with probable knowledge of other habitues, Melo would have superior means of locating those in the ring; so also, as a regular, he might expect to be recognized by those who supposedly attended. The trail was warm on February 8 but was not trod.

The trial judge correctly, in our view, denied motions to curtail the substance of the cross-examination, as well as a motion for a mistrial.

Melo protests that the cross-examination (even if otherwise relevant and proper) was unfairly severe. It is a mistake to call a cross-examination too severe merely because the witness's story is badly shaken by it. To be sure, the prosecutor was strident in her manner and might have been more effective if she recalled the apothegm, suaviter in modo, fortiter in re.

The effect of the judge's instructions was to confine the alibi material at trial to the proper sphere in the consideration of the jury and to warn against its misapplication by them. The judge

---

to produce witnesses likely to be available, by showing that he could not produce them for reasons outside his control. See *Commonwealth* v. *Franklin*, 366 Mass. at 294-295; *Commonwealth* v. *Melendez*, 12 Mass. App. Ct. at 981.

[6]"He is to be held to reasonable effort to produce the witness, and in the absence of any evidence of such effort the rule [allowing unfavorable comment or a missing witness instruction] applies." *Commonwealth* v. *Graves*, 35 Mass. App. Ct. at 85, quoting from *Commonwealth* v. *Spencer*, 212 Mass. 438, 452 (1912).

was well aware of the shoals involved and charged accordingly.[7]

*Judgments affirmed.*

---

[7]Circumspection is called for in making an inference adverse to the accused from missing witness considerations in a criminal prosecution, for "the inference may come uncomfortably close to invading constitutional rights." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 135 & n.10 (1986). But such concerns (about impairment of defendant's right against self-incrimination, and right without blame to refuse to testify) are reduced where the defendant testified in his own behalf and thereby "opened the issue of his credibility and was subject to scrutiny on that ground." *Commonwealth* v. *Graves*, 35 Mass. App. Ct. at 81 n.7, quoting from *Commonwealth* v. *Bryer*, 398 Mass. 9, 12 (1986). The judge instructed fully on the Commonwealth's fixed burden of proving guilt beyond a reasonable doubt.