NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11617

COMMONWEALTH vs. LARRY HOUSEWRIGHT.


Bristol.    October 7, 2014. - February 19, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Intimidation of Witness. Firearms. Assault by Means of a Dangerous Weapon. Evidence, Testimony at prior proceeding, Previous testimony of unavailable witness, Unavailable witness, Photograph, Firearm. Witness, Intimidation, Unavailability. Constitutional Law, Confrontation of witnesses. Practice, Criminal, Confrontation of witnesses.



     Complaint received and sworn to in the New Bedford Division of the District Court Department on May 17, 2010.

     After transfer to the Fall River Division of the District Court Department, the case was tried before Kevin J. Finnerty, J.

     The Supreme Judicial Court granted an application for direct appellate review.


     Benjamin Evans, Committee for Public Counsel Services, for the defendant.
     Shoshana E. Stern, Assistant District Attorney, for the Commonwealth.

GANTS, C.J.  On May 11, 2010, the defendant, Larry Housewright, pointed a weapon at a second-story window where a witness in his friend's criminal case was standing, and fired as the truck in which he was a passenger drove away.  A District Court jury convicted the defendant of intimidating a witness, carrying a firearm without a license, discharging a firearm within 500 feet of a building, and assault by means of a dangerous weapon.  On appeal, the defendant claims that (1) the judge abused his discretion in allowing the Commonwealth to present a witness's prior recorded testimony without sufficient proof of the witness's unavailability; (2) the judge abused his discretion in admitting two photographs of a handgun that looked like the unrecovered handgun fired by the defendant; and (3) the judge erred in denying the defendant's motion for a required finding of not guilty because the evidence was insufficient to support the conviction of unlawful carrying of a firearm, where no reasonable jury could find beyond a reasonable doubt that the defendant's handgun was capable of discharging a bullet.

Although we find no error in the admission of the photographs or in the denial of the motion for a required finding of not guilty, we conclude that the judge abused his discretion in determining that the Commonwealth's witness was unavailable to testify based solely on a doctor's four-sentence letter that listed her medical conditions and opined that the

stress of testifying in court "might" be detrimental to the witness's health.  Because the admission of the witness's prior recorded testimony without an adequate showing of the witness's unavailability violated the defendant's constitutional right to confront the witness, and because the error was not harmless beyond a reasonable doubt, we vacate the convictions and remand for a new trial.

Background.  We briefly describe the evidence at trial, reserving discussion of the evidence that is relevant to the issues raised on appeal.

In 2010, Doris Williams owned a two-family house in New Bedford, and lived in the first-floor apartment; Kim Sivertsen and Aaron Tobia lived together on the second floor.  In February of that year, Williams's grandson, Matthew Borges,[1] was charged with breaking and entering the second-floor apartment.  On May 5, Sivertsen and Tobia attended a pretrial conference in the case against Matthew, during which Matthew made threatening gestures aimed at them, such as drawing his finger across his neck, pointing his finger in the form of a gun, and hitting his fist against his other hand.  When Sivertsen left the court house, she saw a white truck with distinctive features pull up in front of the court house and pick up Matthew and his brother,

_____

[1] Because Matthew Borges and various witnesses share the same surname, we will refer to them by their first names.

Joshua Borges. Because the truck's windows were tinted, she could not see the faces of any other people in the truck.

On May 11, Sivertsen was returning to her apartment at approximately 3:15 P.M. when she saw the same white truck from the court house parked on the street outside her apartment, with a woman in the driver's seat and two passengers. Sivertsen knocked on Williams's front door to ask if she was expecting anyone. Williams, whose prior recorded testimony was presented at trial, stated that when she opened the door, she saw the defendant open the passenger side door and say, "Hi Grandma." Williams had known the defendant since he was a child; her grandson, Matthew, and the defendant were childhood friends, and the defendant always called her "Grandma." She asked the defendant what he was doing in the neighborhood, and he responded, "I'm waiting for someone."

Sivertsen testified that the defendant shouted that he was the one that picked up Matthew from the court house and that he was there to pick up "Mikey."[2] The defendant then told Sivertsen, "Tell your boyfriend I have something for him," and pulled out a small, silver gun and showed it to her. After Sivertsen said she was going to call 911, the truck began moving away, but as it was leaving, the defendant pointed the gun out of the passenger's side window and fired it at the second-floor

_____

[2] One of Doris Williams's grandchildren was named Michael.

window where Tobia was standing. Williams had already reentered her home, and "didn't see anything" related to the shooting.[3] The police were unable to locate any shell casings, bullets, bullet holes, or other property damage.

Williams's son, Stephen Borges, who was Matthew's uncle, was in the cellar of Williams's apartment at the time of the incident. From the cellar, he heard "a gunfire go off," which caused him to run outside. He saw the white truck leave and recognized someone who "hung around with Matthew." He got into his own vehicle and followed the white truck until it parked, where he saw Matthew and the defendant get out. A day or two after the incident, Stephen returned to the area where the white truck parked and saw it again. He recorded the license plate number and later gave that number, the name of the defendant, and the location of the white truck to Williams.

On May 12, Sivertsen provided Detective William Sauvé with a physical description of the assailant, which he used to assemble a six-photograph sequential array that included the defendant. When Sivertsen viewed the array, she did not identify the defendant and said she was eighty per cent certain

---

[3] Williams initially testified at the prior recorded hearing, "He only fired once. And he aimed for the second floor." But she then clarified that she did not actually see the shot. She only "heard it." It was Aaron Tobia who told her that the sound was gunfire and that "the guy pointed [the gun] up to the window."

that one of the other photographs depicted the perpetrator.[4]

Tobia viewed the same set of photographs and, despite stating he was ninety per cent confident, chose not to make an identification.[5]

A couple days later, Williams went to the police station with her daughter, Laurie Borges, to view the photographic array.[6] They viewed the array together, and Williams picked a photograph of the defendant, saying it looked like the assailant, but she was not positive because the person in the photograph had a beard, but she remembered the defendant best without facial hair. Detective Sauvé then printed an older photograph of the defendant, where he did not have facial hair, and displayed it to Williams and Laurie, who both said that it showed the defendant.

---

[4] At trial, when showed the photographic array again (in simultaneous form), Kim Sivertsen could not identify which photograph she originally thought showed the perpetrator, but she identified the defendant in court as the man in the passenger seat and stated that she was one hundred per cent confident in her identification. She explained that the defendant's large stature is his most identifying feature, which is not well depicted in a photograph.

[5] At trial, Tobia identified the defendant in-court and explained that he had been unable to be fully confident in making an identification without seeing the person in front of him, as photographs only show the face, and the perpetrator was a big person.

[6] Laurie Borges was not an eyewitness to the events on May 11, 2010.

While meeting with Detective Sauvé, Williams also provided the information that she received from her son, Stephen:  the white truck's license plate number, the defendant's name, and the location where her son found the white truck.  Detective Sauvé found the white truck at the location, obtained an arrest warrant, and arrested the defendant.  At the time of the arrest, the defendant was living with his girlfriend, Melissa Gomes, at the address where both Stephen and Detective Sauvé had observed the truck.

At trial, the defendant, through the testimony of his cousin, Eliot Spooner, presented an alibi that he was being driven to St. Luke's Hospital when the shooting occurred. Spooner testified that the defendant and he were working at a farm in Rochester on May 11, and at approximately 2:45 P.M., Spooner injured his finger while splitting wood.  Spooner and the defendant called Gomes, who picked them up at around 3:15 P.M. to drive them to the hospital.  They arrived at the hospital at approximately 3:50 P.M.  At the hospital, the defendant stayed with Spooner for at least one-half hour to one hour while Spooner waited to see the doctor.

Discussion. 1. Prior recorded testimony.  On the first day of trial, the Commonwealth filed a motion in limine to admit Williams's prior testimony from the defendant's pretrial detention hearing, conducted pursuant to G. L. c. 276, § 58A, on

May 21 and 24, 2010.  The Commonwealth argued that Williams was unavailable due to illness and that her testimony fell within the hearsay exception for prior recorded testimony of an unavailable declarant.  See Mass. G. Evid. § 804(b)(1) (2014) (hearsay exception, if declarant is unavailable, for testimony given at another trial or hearing, where party against whom testimony is offered had opportunity and similar motive to develop testimony by direct, cross-, or redirect examination).

a.  <u>Unavailability due to illness or infirmity</u>.  To show that Williams was unavailable to testify at trial, the Commonwealth relied on her returned summons, which noted that she would not be able to attend the trial because she was "under doctor's care," and on a letter from her doctor, which declared:

> "Doris Williams is a 74 year old patient under my care for: cardiomyopathy, coronary artery disease, peripheral vascular disease, arthritis and angina.  It is my medical opinion that the stress of testifying in court might be detrimental to her health.  I urge you to exclude her from your witness list."

The letter also provided the doctor's office telephone number "[i]f you require additional information."

The defendant objected to the admission of Williams's prior testimony on various grounds, including the insufficiency of the doctor's letter to establish unavailability.  The judge overruled the objection and allowed the motion to admit Williams's prior recorded testimony, noting that "if she's under

a physical infirmity that puts her health at risk for testifying, I think that would be a sufficient basis to find her unavailable."

On appeal, the defendant argues that the admission of Williams's prior testimony violated his right to confront the witness under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[7]  We address initially the defendant's claim that the Commonwealth did not sufficiently prove that the witness was unavailable.[8]

"In [Crawford v. Washington, 541 U.S. 36, 57-59 (2004)], the United States Supreme Court held that testimonial out-of-court statements made by a declarant who is not a witness at trial are inadmissible under the confrontation clause of the Sixth Amendment, unless the declarant is unavailable to testify

---

[7] The defendant does not argue that the right of confrontation under art. 12 of the Massachusetts Declaration of Rights affords greater protection than the Sixth Amendment of the United States Constitution, so we do not discuss these provisions separately.  See Commonwealth v. Arrington, 455 Mass. 437, 440 n.4 (2009), quoting Commonwealth v. DeOliveira, 447 Mass. 56, 57 n.1 (2006) ("Although art. 12 has been interpreted to provide a criminal defendant more protection than the Sixth Amendment in certain circumstances, . . . 'in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment'" [citation omitted]).

[8] We only address the meaning of unavailability in criminal cases where the Commonwealth is the proponent of the evidence, thereby implicating the defendant's right of confrontation.

and the defendant has had an adequate prior opportunity to cross-examine the declarant." Commonwealth v. Hurley, 455 Mass. 53, 60 (2009). The Sixth Amendment establishes "a rule of necessity, i.e., that the prosecution either produce, or demonstrate the unavailability of, the declarant." Commonwealth v. Roberio, 440 Mass. 245, 247 (2003).

Because there is no definition of the word "unavailability" in our statutes or rules, "[w]e therefore review those cases in which this particular exception to the hearsay rule has been applied." Commonwealth v. DiPietro, 373 Mass. 369, 380 (1977). Although we declared in Commonwealth v. McKenna, 158 Mass. 207, 210 (1893), that a witness cannot be unavailable because of illness, we have since held that "a classic case of unavailability" was shown where a witness was "hospitalized suddenly for kidney stone surgery on the second day of . . . trial" and the witness's doctor stated by letter that the witness would not be released from the hospital until the day the evidence was expected to (and did) close and would not be available to testify until seven days later. Roberio, 440 Mass. at 249-250. See Mass. G. Evid. § 804(a)(4) (2014) (witness may be unavailable "because of . . . then-existing physical or mental illness or infirmity"). However, we have yet to provide trial judges with a framework to analyze whether a witness is unavailable because of illness or infirmity. We do so now.

Where the Commonwealth claims that its witness is unavailable because of illness or infirmity and that it wishes to offer in evidence the prior recorded testimony of that witness, the Commonwealth bears the burden of showing that there is an unacceptable risk that the witness's health would be significantly jeopardized if the witness were required to testify in court on the scheduled date.  To meet this burden, the Commonwealth must provide the judge with reliable, up-to-date information sufficient to permit the judge to make an independent finding.  See Commonwealth v. Bohannon, 385 Mass. 733, 744-745 (1992) (second motion judge could not rely on first motion judge's unavailability determination made eight months before trial).  See also Burns v. Clusen, 798 F.2d 931, 935, 942-943 (7th Cir. 1986) (prosecutor should have provided more current information where latest unavailability hearing was held three months before trial).  If reliable, an unsworn letter from a physician may be adequate, but only if it provides sufficient detail about the witness's current medical condition to allow the judge to evaluate the risk that would be posed if the witness were to testify in court -- a conclusory assertion is not enough.  See United States v. Gabrion, 648 F.3d 307, 340 (6th Cir. 2011) (doctor's note was sufficient, because it "was specific as to the nature of each [witness's] illness and very clear in [the doctor's] opinion that the [witnesses'] health

would be jeopardized if they were forced to testify at the trial"); United States v. McGuire, 307 F.3d 1192, 1205 (9th Cir. 2002) (doctor's note was sufficient where there was "no reason to doubt the reliability of the evidence concerning [the witness's] infirmity").

A judge, in his or her discretion, may require more information than is contained in a doctor's letter regarding the witness's medical condition, and may direct the means to obtain that additional information, such as a supplemental letter or affidavit, a call to the physician over speaker telephone in the presence of the attorneys, a deposition of the physician, or a court hearing. See United States v. Donaldson, 978 F.2d 381, 393 (7th Cir. 1992) (trial judge "held a hearing the day [the witness] was to testify to determine her availability"); Parrott v. Wilson, 707 F.2d 1262, 1268 (11th Cir. 1983) (parties deposed witness's psychiatrist). In determining whether the risk that the witness's health would be jeopardized is unacceptable, a judge should consider the probability that the witness's appearance will cause an adverse health consequence, the severity of the adverse health consequence, such as whether it would be life-threatening, the importance of the testimony in the context of the case, and the extent to which the live trial

testimony would likely differ from the prior recorded testimony.[9] See United States v. Faison, 679 F.2d 292, 297 (3d Cir. 1982) (trial judge must consider witness's importance to case, nature and extent of cross-examination in earlier testimony, nature of illness, probable duration of illness, and any special circumstances counselling against delay). See also Ecker v. Scott, 69 F.3d 69, 72 (5th Cir. 1995) (judges should consider "Faison factors" to determine unavailability).

Where a judge finds that that there is an unacceptable risk that the witness's health would be jeopardized if the witness were required to testify in court on the scheduled date, the judge should then consider whether the risk would be acceptable if the trial were continued to a future date. See Faison, supra at 296 (trial judge should consider possibility of adjourning trial for reasonable period to afford witness enough time to recover from illness). Where a continuance would change the risk calculus, the judge should determine whether, considering all the circumstances, a continuance would serve the interests of justice, taking into account the burden of such a continuance on the court, the parties, the other witnesses, and the victims. See id. at 297 n.4. Thus, a witness is unavailable if there is

---

[9] As to this last factor, the prior recorded testimony will generally be similar to live trial testimony where it was recorded in an earlier trial in the same case, and less similar where it was recorded at a pretrial hearing, such as a detention hearing, as it was in this case.

an unacceptable risk that the witness's health would be jeopardized by testifying in court on the scheduled date and either (1) a continuance would not reduce the risk to an acceptable level, or (2) a continuance would make the risk acceptable but would not serve the interests of justice.

In addition, before determining whether to admit prior recorded testimony of an unavailable witness, the judge should consider whether there would be an unacceptable risk that the witness's health would be jeopardized if the witness's testimony were obtained through a deposition at a suitable out-of-court location, such as an attorney's office, the witness's home, or a health facility. See Mass. R. Crim. P. 35 (g), 378 Mass. 906 (1979) (deposition admissible as substantive evidence where deponent is unable to testify at trial "because of . . . physical or mental illness or infirmity"). See also United States v. Keithan, 751 F.2d 9, 12-13 (1st Cir. 1984) (finding no abuse of discretion in admission of videotaped depositions at trial where one witness was "eighty-seven years old at the time of trial and suffered from a back condition which prevented him from walking" and second witness was "eighty-three years old and suffered from a heart condition which confined her to her home"). If the witness is unavailable, a deposition may be admissible in evidence and, especially if videotaped, may be the best alternative to the witness being at trial. See United

States v. McGowan, 590 F.3d 446, 456 (7th Cir. 2009)
("videotapes allowed the jury to fully experience [the
witness's] testimony, to view her demeanor, to hear her voice
and to determine her credibility").[10]

Additionally, the Commonwealth must make "a good faith
effort to . . . produce the witness at trial." Commonwealth v.
Sena, 441 Mass. 822, 832 (2004). See Commonwealth v. Ross, 426
Mass. 555, 557-558 (1998) ("The Commonwealth must exercise
substantial diligence in order to meet its burden of showing a
witness's unavailability"). The "good faith effort" requirement
is most commonly at issue where unavailability stems from an
inability to locate and procure the witness from outside the
jurisdiction.[11] But the requirement applies to all cases of

---

[10] Where the witness had previously testified at a trial in
the same case, we leave to the discretion of the trial judge
whether, in view of the precarious health of the witness or the
witness's present mental condition, the deposition would be
preferable to the prior recorded testimony. Moreover, a judge
also retains discretion to determine the form of the deposition.
Although a videotaped deposition is generally preferable,
because personal observation of a witness "aids immeasurably" a
jury's evaluation of a witness's credibility, see Commonwealth
v. Bergstrom, 402 Mass. 534, 548 (1988), it is not a perfect
substitute for live testimony. See id. at 550 ("we cannot
conclude that reducing the life-size picture of trial testimony
to the image on a television screen affords to a jury the
equivalent of personal observation").

[11] See, e.g., Commonwealth v. Sena, 441 Mass. 822, 832-833
(2004) (good faith demonstrated by enlisting authorities in
Puerto Rico to search for witness one week prior to trial);
Commonwealth v. Florek, 48 Mass. App. Ct. 414, 415-416 (2000)
(failure to show good faith where Commonwealth knew witness's

unavailability where there is some possibility that the witness may be produced.  See Ohio v. Roberts, 448 U.S. 56, 74 (1980) (good faith requirement may apply where there is remote possibility that affirmative measures might produce witness). Where a witness is unavailable due to illness or infirmity, the "good faith effort" required of the Commonwealth is to promptly inform the court and the defendant of the unavailability of the witness once the Commonwealth learns of it, so that they have an adequate opportunity to learn more about the witness's medical condition and to explore the alternative of a continuance or a deposition.  Where the unavailability of the witness is not made known until the first day of trial, the defendant has little opportunity to investigate the witness's medical condition to challenge the prosecutor's claim of unavailability.  At that juncture, ordering a continuance or scheduling a deposition might be impracticable, effectively denying the defendant the possibility of these alternatives.

Here, Williams received a summons on October 18, 2011, and returned it with a notation that she would not be able to testify at trial because she was under a doctor's care. Williams also provided the Commonwealth the doctor's letter dated October 24.  Yet, the Commonwealth did not file its motion

---

Kentucky address but did little more than send summons to produce witness).

in limine, or otherwise alert the court or the defendant of the witness's unavailability until November 15, the first day of trial.[12]  By not promptly informing either the defendant or the judge of the witness's unavailability after receipt of the doctor's letter, the Commonwealth limited their opportunity to obtain further information about the witness's medical condition; all that reasonably was available was the option invited by the doctor to telephone him for additional information.  This option was not pursued, and the judge rested his ruling solely on the doctor's letter.

Because the letter did not provide a sufficient factual basis to support the judge's finding of unavailability, we conclude that the judge abused his discretion in making such a finding on the letter alone.  The doctor's medical opinion "that the stress of testifying in court might be detrimental to her health" offered no guidance as to the likelihood that testifying would have an adverse health consequence or as to the severity of the health consequence.  The letter listed the witness's various medical conditions but provided no guidance as to their stage, severity, duration, or symptoms, or as to the limitations they impose on everyday activity.  Nor did the letter provide

---

[12] The record does not reflect when the prosecutor received the doctor's letter or the returned summons, but the Commonwealth at oral argument did not challenge the contention that the prosecutor learned of the witness's unavailability well before the judge or the defendant was advised of it.

any guidance whether the health risks would be obviated or significantly lessened if she were to testify through a deposition. Especially where Williams offered important identification testimony and where her prior recorded testimony was taken at a pretrial detention hearing rather than an earlier trial, more detailed information than was provided in this letter is required to support a finding of unavailability. Although we rest our conclusion on the insufficiency of the doctor's letter, our conclusion is strengthened by the Commonwealth's failure to make the "good faith effort" of providing timely notice to the court and the defendant of its claim of unavailability.

Having found that the defendant was denied his constitutional right of confrontation by the insufficiency of the evidence that Williams was unavailable to testify, we consider whether the error was harmless beyond a reasonable doubt. See Commonwealth v. Burgess, 450 Mass. 422, 431-432 (2008). We conclude it was not. In determining whether an error is harmless beyond a reasonable doubt, the "essential question" is whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the jury's verdicts. Commonwealth v. Vasquez, 456 Mass. 350, 360 (2010), quoting Commonwealth v. Perrot, 407 Mass. 539, 549 (1990).

Here, Williams's prior recorded testimony contained important statements of identification. Stephen identified the defendant, but only as the person getting out of the truck with Matthew after he followed the truck out of the neighborhood. Williams was the only witness who recognized the defendant at the scene of the crime, and later identified him at an out-of-court identification procedure. Neither Sivertsen nor Tobia -- the two eyewitnesses to the crime -- could identify the defendant at the pretrial identification procedure. Williams's identification carried evidentiary weight because she knew the defendant well and, at the scene of the crime, he called her by the name he always called her, "Grandma." Had her prior recorded testimony been excluded, the jury would also not have heard Detective Sauvé's testimony regarding Williams's identification of the defendant at the identification procedure, because a witness's pretrial identification is admissible for substantive purposes only where "the identifying witness testifies at trial and is subject to cross-examination." Commonwealth v. Barbosa, 463 Mass. 116, 130 (2012). See Mass. G. Evid. § 801(d)(1)(C) (2014). Thus, we conclude that the erroneous admission of her testimony was not harmless beyond a reasonable doubt. Therefore, we must vacate the defendant's convictions and remand for a new trial.

b.  Reasonable opportunity and similar motivation.  The defendant also claims that, even if Williams were unavailable, her prior recorded testimony should not have been admitted because the defendant did not have a reasonable opportunity or similar motivation to cross-examine the witness at the pretrial detention hearing.  See Commonwealth v. Arrington, 455 Mass. 437, 442 (2009), quoting Commonwealth v. Trigones, 397 Mass. 633, 638 (1986) (prior testimony must have been given "in a proceeding addressed to substantially the same issues" as current proceeding, with "reasonable opportunity and similar motivation" for cross-examination).  Because Williams may be found unavailable on retrial, we address this claim of error.

"A defendant has an adequate prior opportunity to cross-examine an unavailable witness when (1) the declarant was under oath at the prior proceeding . . . ; (2) the defendant was represented by counsel at the prior proceeding . . . ; (3) the prior proceeding was conducted before a judicial tribunal, equipped to provide a judicial record of the hearings . . . ; and (4) the prior proceeding was addressed to substantially the same issues as in the current proceeding, and the defendant had [a] reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant" (quotations and citations omitted).  Hurley, 455 Mass. at 60.  The defendant contends that he did not have "reasonable opportunity and

similar motivation" to cross-examine Williams at the pretrial detention hearing for two reasons:  first, his attorney could not explore any potential inconsistencies between the testimonies of Williams and Stephen, where the police did not know that Stephen was a witness at the time of the hearing; and second, his attorney's primary goal on cross-examination at that hearing was to show that the defendant would not "endanger the safety of any other person or the community," G. L. c. 276, § 58A, rather than to challenge the witness's identification or credibility.[13]

The "reasonable opportunity" requirement was satisfied here, because the defendant had a reasonable opportunity to cross-examine the witness regarding her testimony on direct examination; defense counsel does not need to have had the same opportunity to question the witness about the testimony of other witnesses.  See Hurley, supra at 62-63, quoting Roberio, 440 Mass. at 251 ("what is essential is that the 'trier of fact [have] a satisfactory basis for evaluating the truth of the prior statement'").  Nor does a "reasonable opportunity" mean

---

[13] To determine whether a defendant is so dangerous "that no conditions of release will reasonably assure the safety of any other person or the community," a judge may consider, among other issues, "the nature and seriousness of the danger posed by the defendant if released, and the defendant's family ties, employment record, history of mental illness, record of convictions, and reputation." Commonwealth v. Hurley, 455 Mass. 53, 61 (2009), quoting G. L. c. 276, § 58A (3), (5).

that defense counsel must have obtained the same discovery at the time of the prior hearing as counsel has at the time of trial. See Hurley, supra at 62, quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985) ("A defendant is not entitled under the confrontation clause to a cross-examination that is 'effective in whatever way, and to whatever extent, the defense might wish'").

Although "there may be circumstances in which a defense counsel's motive to cross-examine a declarant at a pretrial detention hearing may differ from her motive to cross-examine at trial, such as where the defense counsel did not challenge the declarant's accuracy or credibility at cross-examination in the prior hearing and focused solely on challenging the defendant's dangerousness," Hurley, supra at 63 n.9, those are not the circumstances of this case. The defendant's cross-examination of Williams focused primarily on challenging the reliability of her identification of the defendant and distinguishing what Williams actually saw from what she learned from other witnesses. Defense counsel elicited Williams's admission that she did not see anybody fire the gun, that her information about who fired the gun or that a gun was fired at all came from other witnesses, and that she could not be sure whether the bearded man shown in the photographic array was the same person she identified in the single photograph. Although the cross-

examination also established that the defendant had never threatened Williams, and that she had never heard that he had engaged in violent behavior, the primary focus of the cross-examination was not to demonstrate that the defendant was not dangerous.  Nor could it reasonably have been the primary focus, where Williams only knew the defendant as her grandson's childhood friend and had not seen him for one and one-half years prior to the incident.  Therefore, we conclude that if Williams is determined to be unavailable, redacted portions of her pretrial testimony would be admissible on retrial.[14]

2. <u>Admission of photographs of similar firearm</u>.  At trial, Tobia testified that the firearm in the defendant's possession was a silver-colored Derringer, stating that he recognized it as such because his father is an avid hunter who owns a few Derringers and that he has "handled" Derringers.  The

---

[14] Because the issue may arise on retrial, we emphasize that Williams's pretrial testimony should not be admitted in its entirety.  Some of her prior testimony contained hearsay that is admissible at a pretrial detention hearing under G. L. c. 276, § 58A, see <u>Abbott A</u>. v. <u>Commonwealth</u>, 458 Mass. 24, 34 (2010), but would not be admissible at trial unless it fell within a hearsay exception.  See <u>Commonwealth</u> v. <u>Wright</u>, 469 Mass. 447, 464-465 (2014) (some of witness's prior recorded testimony, conveying what her husband had said, "constitute[d] classic 'totem pole' or 'layered' hearsay" and would not be admissible).  Moreover, some of her testimony at the pretrial detention hearing vouched for the truthfulness of Sivertsen and Tobia, and should not be admitted.  See <u>Commonwealth</u> v. <u>Quinn</u>, 469 Mass. 641, 646 (2014) ("No witness, neither a lay witness nor an expert, may offer an opinion regarding the credibility of another witness").

Commonwealth presented two photographs to Tobia that he said depicted a Derringer, although not the Derringer Tobia actually saw on May 11.  Even though both the prosecutor and defense counsel pointed out that the photographs did not show the actual gun used, the defendant objected to the admission of the photographs in evidence and argues on appeal that the judge abused his discretion in admitting them.  In the event the issue is raised again on retrial, we conclude that it was not an abuse of discretion for the judge to admit the exemplar photographs.

"Where for whatever reasons original items of physical evidence cannot be produced, substitutes similar to the originals have often been received as exhibits, in criminal as well as civil trials, to illustrate and corroborate testimony in which the originals figured:  the admission of such [exemplars] is well understood to rest in the discretion of the court." Commonwealth v. Luna, 46 Mass. App. Ct. 90, 93 (1998).  Where it is made clear at trial that photographs simply depict a similar-looking firearm and do not depict the actual firearm used in the incident, it is not an abuse of discretion to admit the exemplar photographs.  See Commonwealth v. Ellis, 373 Mass. 1, 7 (1977) (no abuse of discretion where "prosecution made it clear by questions that the model was not the murder weapon but was merely illustrative"); Commonwealth v. Souza, 34 Mass. App. Ct. 436, 444-445 (1993) (spiked wristband "similar but perhaps not

identical" to one used in crime was admissible where questioning made clear that witness could not say that exemplar wristband was actual wristband used in attack).  Although the judge did not give a limiting instruction to remind the jury that the photographs were only exemplars, see Commonwealth v. Stewart, 398 Mass. 535, 542 n.6 (1986), such an instruction is not mandatory and was not necessary where the status of the photographs as exemplars was made clear from the testimony.[15] See Luna, supra at 94 (absence of limiting instruction was not error where fact "[t]hat the exhibit was only a stand-in was stated repeatedly . . . could not have been lost on the jury").

3.  Sufficiency of evidence for conviction of unlawful carrying of a firearm.  At the close of the Commonwealth's evidence and again at the close of all the evidence, the judge denied the defendant's motion for a required finding of not guilty as to the charge of unlawful carrying of a firearm, in violation of G. L. c. 269, § 10 (a).  On appeal, the defendant contends that the evidence was insufficient as a matter of law, because to be a "firearm," as defined under G. L. c. 140, § 121, the weapon must be capable of discharging a shot or bullet.  See Commonwealth v. Sampson, 383 Mass. 750, 753 (1981) (firearm must be "[1] a weapon, [2] capable of discharging a shot or bullet,

_____

[15] The judge declared that he intended to give a limiting instruction on the exemplars but did not do so.  There was no objection to the absence of a limiting instruction.

and [3] under a certain length").[16]  We address this issue even though we have vacated the convictions because, if the defendant is correct, he would be entitled to a judgment of acquittal and not merely a new trial.

We conclude that, viewed in the light most favorable to the Commonwealth, the evidence was sufficient to permit a reasonable jury to conclude beyond a reasonable doubt that the gun the defendant displayed was capable of discharging a bullet, even where there was no gun found, no casings or bullets recovered, no ballistics evidence, and no expert testimony.  As earlier noted, Tobia testified that he saw the defendant point a gun at him, which he knew to be a Derringer from his experience with firearms.  He saw the defendant struggle with the gun after it misfired, break it open to extract two shells, load it again, and fire it at him.  When the gun fired, Tobia "saw the flash come out of the barrel of the gun," and heard a "big, bang noise," which sounded "exactly the same" as the gunshots he had heard when he went shooting with his father.[17]  From the

---

[16] The Commonwealth need not show that the gun was actually capable of discharging a bullet at the time of the incident; it need only show that the gun was capable of doing so with a "relatively slight repair, replacement, or adjustment." Commonwealth v. Bartholomew, 326 Mass. 218, 220 (1950).  See Commonwealth v. Jefferson, 461 Mass. 821, 828 (2012).

[17] Sivertsen also testified to seeing a small, silver gun and hearing a "loud bang like a gun noise."  Stephen Borges testified that from the apartment cellar he heard "a gunfire go

witnesses' testimony, a reasonable jury could find beyond a reasonable doubt that the defendant loaded and then fired a weapon that looked like a gun, sounded like a gun, and flashed like a gun.  With this evidence, a reasonable jury did not need expert testimony to find beyond a reasonable doubt that the gun was capable of discharging a bullet and, consequently, was a "firearm" that was unlawfully carried by the defendant.  See Commonwealth v. Tuitt, 393 Mass. 801, 809-810 (1985) (expert testimony unnecessary to prove gun was capable of discharge where defendant threatened victim with gun and said, "Don't get killed over anybody else's money"); Commonwealth v. Stallions, 9 Mass. App. Ct. 23, 25-26 (1980) (jury could determine whether revolver was capable of discharging bullet without any evidence that revolver had been tested and found operable).

Conclusion.  We conclude that the judge erred by allowing the Commonwealth to introduce prior recorded testimony without sufficient proof of the witness's unavailability.  Because the error was not harmless beyond a reasonable doubt, we vacate the judgments of conviction and remand the case for a new trial consistent with this opinion.

So ordered.

---

off," and that he could discern that the sound was gunfire because he was "brought up around guns" and could distinguish between a gunshot and fireworks.  Moreover, the across-the-street neighbor, Paul Sarmento, testified to hearing a sound like a truck backfiring -- "a pow sound."