SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. WARRENS GELIN

 
 Docket:
 SJC-13433
 
 
 Dates:
 December 4, 2023 - October 15, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.
 
 
 County:
 Hampden
 

 
 Keywords:
 Controlled Substances. Firearms. Practice, Criminal, Revocation of probation, Assistance of counsel, Hearsay. Constitutional Law, Assistance of counsel, Equal protection of laws. Evidence, Hearsay, Intent, Inference, Firearm. Intent.
 
 

 
            Indictments found and returned in the Superior Court Department on May 23, 2017.
            A proceeding for revocation of probation was heard by Francis E. Flannery, J., and a motion for a new hearing was considered by him.
            The Supreme Judicial Court granted an application for direct appellate review.
            Owen Murphy for the defendant.
            Travis H. Lynch, Assistant District Attorney, for the Commonwealth.
            The following submitted briefs for amici curiae:
            Rebecca Kiley, Committee for Public Counsel Services, Adam Murphy, Catherine Logue, & Ashok Chandran, of New York, & Jessie J. Rossman for Committee for Public Counsel Services & others.
            Hannah L. Kilson for Boston Bar Association.
            Katharine Naples-Mitchell, Lia Monahon, & Joshua M. Daniels for Criminal Justice Institute at Harvard Law School & another.
            GEORGES, J.  While on probation in the Superior Court, Warrens Gelin (probationer), was arrested during a traffic stop and charged with new criminal offenses, including possession of cocaine with intent to distribute and unlawful possession of a firearm.  After a probation violation hearing, a Superior Court judge found him in violation of the conditions of his probation, revoked his probation, and sentenced him to a term in State prison.  The probationer challenges the judge's determination that he violated the conditions of his probation, arguing that the evidence was insufficient for the judge to find that he possessed cocaine with intent to distribute and unlawfully possessed a firearm.[1]  
            The probationer also appeals from the denial of his motion for a new probation violation hearing, which was predicated on a claim of ineffective assistance of counsel.  Specifically, he contends his prior counsel was ineffective for not moving to suppress the evidence presented at the violation hearing on equal protection grounds because the State trooper who initiated the traffic stop was motivated by racial animosity.  
            We disagree with the probationer's claims of error.  Accordingly, we affirm the judge's revocation of probation and the denial of the probationer's motion for a new hearing.[2]  
            Background.  On October 26, 2018, the probationer pleaded guilty to three counts of armed robbery, G. L. c. 265, § 17, as well as other related charges.[3]  He was sentenced to serve from four to five years in State prison followed by two years of probation.  Among other things, the conditions of probation prohibited the probationer from committing any crime and from possessing, owning, or transferring any firearm, ammunition, or dangerous weapon as defined in G. L. c. 269, § 10 (b).  
            1.  The traffic stop.  We recite the facts the judge could have found based on the evidence presented at the probation violation hearing.[4]  We reserve further recitation of the facts for later discussion.[5]  
            On October 12, 2021, at 3:46 P.M., State police Trooper Bryce Molnar was monitoring traffic from his cruiser along Interstate Highway 91 in Holyoke.  While stationary in the median, he observed a vehicle with no front license plate traveling in the left lane "at a high rate of speed, only slowing as it got too close to the vehicle ahead of it," forcing the other vehicle to move over to the right lane.  Molnar pulled out from the median and began following the speeding vehicle.  The vehicle's windows were tinted; Molnar could not identify the race or gender of any of the occupants, though he could see the outlines of multiple persons.  As Molnar would later discover, one of these persons -- the front seat passenger -- was the probationer.  Molnar also noticed that the back seat passenger appeared to be moving around.  
            As he followed the vehicle, Molnar observed the operator begin to "driv[e] over the yellow fog line . . . almost striking the rumble strip," before changing lanes in "a rapid, unsafe manner, almost cutting off the vehicle in the right lane."  In response, Molnar activated his cruiser's emergency lights.  The driver would later testify before a grand jury that, as the vehicle was pulling over, the probationer removed a green bag,[6] which the probationer had possessed when the driver initially picked him up, and threw it to the back seat passenger, who separately possessed a gray backpack.  Around the same time, Molnar observed the back seat passenger "turn around in the vehicle and sit higher on the seat and appear to be looking back at [him]."  
            Molnar approached the stationary vehicle, knocking on the back window to indicate he wanted the occupants to lower the window.  Although he could see the outline of a person through the window tint, it was not clear enough for Molnar to see inside.  Once the back window was lowered, Molnar could, for the first time, clearly observe three occupants in the vehicle:  the driver, a front seat passenger, and a back seat passenger.  The driver was a White male.  Sitting in the front passenger seat was a Black male -- the probationer, as earlier noted.  The back seat passenger, another Black male, was not wearing a seatbelt and was seated next to the green bag and the gray backpack.  Molnar observed the back seat passenger continue to move around, reaching "in and out" of one of the bags.  
            When asked about their destination, the driver explained he was working as a "hood Uber"[7] driver and was taking the two passengers to North Adams.  While speaking with the driver and the probationer, Molnar observed the back seat passenger "staring" at the green bag.  Molnar asked the back seat passenger for his identification.  The passenger responded he did not have any identification because he had recently been released from prison.  
            Based on his experience from prior arrests where suspects attempted to conceal a firearm, Molnar interpreted the conduct of the back seat passenger -- i.e., turning around to look at the trooper as he was approaching, reaching "in and out" of one of the bags, and continuing to stare at the green bag -- to be consistent with an attempt to conceal a weapon.  He removed the back seat passenger from the vehicle to conduct a pat frisk of his person and a search of the bags that had been within his reach for weapons.  While frisking the back seat passenger, Molnar found an identification card, which belonged to another person.  Molnar then secured the back seat passenger in his cruiser.  
            Returning to the vehicle where he had left the driver and the probationer unattended alongside the two bags, Molnar opened the green "military style" bag and discovered multiple white rectangular bricks, which he suspected to be heroin.  Molnar then detained and handcuffed the probationer but did not detain the driver.  He again questioned the driver's involvement with the two passengers.  Both the driver and the probationer indicated the driver did not know the two passengers and was only transporting them to North Adams.[8]  Molnar then asked the probationer how well he knew the back seat passenger, to which the probationer responded by shaking his head.  
            Molnar requested assistance, and a fellow State trooper, Edward Brunton, arrived on scene.  A third trooper arrived a short time later.  Together, the troopers placed the probationer in the back seat of Brunton's cruiser, leaving the driver alone for about three minutes before returning and frisking the driver.  The driver showed Molnar Facebook messages confirming the two passengers had asked to be driven from Springfield to North Adams.  Molnar issued the driver a written warning for driving too close to another vehicle and for the marked lane infraction.  
            Upon searching the gray backpack, Molnar found two additional rectangular bricks of a substance suspected to be heroin, as well as multiple "glassine baggies" filled with a "chunky white substance."  From the green bag and the gray backpack, the State troopers recovered a total of approximately thirty-one grams of suspected "crack" cocaine and approximately 1,000 bags of tan powder in wax folds suspected to be heroin.  After discovering the contraband, Molnar detained the probationer and back seat passenger.  Brunton transported the probationer to the Northampton State police barracks.  The back seat passenger was separately transported by Molnar.  Upon arrival, both parties were booked and searched incident to their arrests.  
            Later that day, during a routine check of the back seat of his cruiser, Brunton discovered a firearm on the floor of his cruiser in the "cage" area, where the probationer was seated earlier.  The firearm, a Glock 23 .40 caliber semiautomatic pistol, was loaded with fourteen rounds of ammunition, including one in the chamber.  Brunton also discovered in the same area a plastic glassine baggie containing an "off-white color chunky substance," believed to be crack cocaine, which was packaged identically to the substance retrieved from the gray backpack.  
            2.  Criminal and probationary proceedings.  Based on the events of the traffic stop, the probationer was arraigned in the Holyoke Division of the District Court Department (Holyoke District Court) on several firearm and drug offenses, including unlawful possession of a firearm, G. L. c. 269, § 10 (a), and possession of a class B controlled substance with intent to distribute, G. L. c. 94C, § 32A (a).  A Hampden County grand jury later indicted the probationer for most of these offenses.[9]  
            Shortly after the probationer's arraignment in the Holyoke District Court, a notice of probation violation issued alleging the probationer committed new criminal offenses,[10] failed to provide drug screens, and failed to pay his probation supervision fees.  A probation revocation hearing was subsequently held before a Superior Court judge.  Based on the evidence introduced by the Commonwealth, the hearing judge found, by a preponderance of the evidence, that the probationer violated the conditions of his probation by, as relevant here, unlawfully possessing a firearm and possessing cocaine with intent to distribute.  The judge revoked the probationer's probation and sentenced him to from two years and six months to three years and six months in State prison; the probationer appealed.  
            3.  Motion for a new hearing.  The Appeals Court granted the probationer's request for a stay of his appeal, and he filed a motion for a new probation violation hearing in the Superior Court.  The probationer argued his counsel was ineffective for failing to file a motion to suppress under the equal protection clause.  In support of his motion, the probationer submitted video footage of the traffic stop.[11]
            The same judge who presided at the probation violation hearing denied the probationer's motion, concluding "[t]he exclusionary rule does not apply to probation [violation] proceedings," and "[a]s such, defense counsel was not ineffective for failing to file a motion seeking that remedy in relation to the probation [violation] proceeding here."  The probationer appealed from the denial of his motion for a new probation violation hearing.  
            After the probationer's direct appeal and his appeal from the denial of his motion for a new hearing were consolidated, this court granted his application for direct appellate review.
            Discussion.  1.  Sufficiency of the evidence.  The probationer contends there was insufficient evidence to support the judge's findings he possessed cocaine with the intent to distribute and possessed a loaded firearm without a license.[12]  We address each of these findings.
            a.  Standard of review.  In reviewing a judge's revocation of probation, we "must determine 'whether the record discloses sufficient reliable evidence to warrant the findings by the judge[, by a preponderance of the evidence,] that [the probationer] had violated the specified conditions of his . . . probation.'"  Commonwealth v. Jarrett, 491 Mass. 437, 440 (2023), quoting Commonwealth v. Morse, 50 Mass. App. Ct. 582, 594 (2000).  "The court reviews a determination to revoke probation for an abuse of discretion."  Jarrett, supra.  
            b.  Possession with intent to distribute cocaine.  Concerning the evidence he possessed cocaine with the intent to distribute, the probationer argues there was insufficient evidence to prove that the substance was cocaine.  He also contends the evidence was insufficient to prove both the possession and intent elements of the crime.  We disagree.
            To establish a probation violation based on a criminal offense, the Commonwealth must prove each element of the offense by a preponderance of the evidence.  See Commonwealth v. Kelsey, 464 Mass. 315, 324-325 (2013).  Accordingly, the Commonwealth was required to prove the substance seized from the vehicle was cocaine.  See Commonwealth v. Vasquez, 456 Mass. 350, 361 (2010) (that substance "is a particular drug" is element of narcotics crime [citation omitted]).  The Commonwealth also was required to prove the probationer possessed this substance with an intent to distribute it.  See G. L. c. 94C, § 32E (b).  
            With respect to whether the substance was cocaine, the probationer argues, in the absence of further evidence of the State troopers' qualifications, the judge erred in concluding the following out-of-court statements were sufficiently reliable hearsay:  (1) Brunton's statement in a police report he believed the substance was crack cocaine based on his training and experience; and (2) Molnar's grand jury testimony that he believed the substance seized was consistent with crack cocaine based on his training and experience in narcotics.  
            Revocation proceedings "must be flexible in nature," and "all reliable evidence should be considered."  Commonwealth v. Durling, 407 Mass. 108, 114 (1990).  Because a probation violation proceeding is not the equivalent of a criminal trial, a probationer is not accorded "the full panoply of constitutional protections applicable at a criminal trial," and we do not require adherence to "strict evidentiary rules."  Id. at 112-114.  Thus, while "[u]nsubstantiated and unreliable hearsay cannot, consistent with due process, be the entire basis of a probation revocation[,] . . . [w]hen hearsay evidence is reliable, . . . it can be the basis of a revocation" (emphasis in original).  Id. at 118.  
            "We review a judge's determination that hearsay is substantially reliable, like other evidentiary decisions, under an abuse of discretion standard."  Commonwealth v. Rainey, 491 Mass. 632, 648 (2023).  To determine whether hearsay is sufficiently reliable, a judge may consider: 
"(1) whether the evidence is based on personal knowledge or direct observation; (2) whether the evidence, if based on direct observation, was recorded close in time to the events in question; (3) the level of factual detail[, as compared to generalized and conclusory assertions]; (4) whether the statements are internally consistent; (5) whether the evidence is corroborated by information from other sources; (6) whether the declarant was disinterested when the statements were made; and (7) whether the statements were made under circumstances that support their veracity."
Commonwealth v. Hartfield, 474 Mass. 474, 484 (2016).  "There is no requirement that hearsay satisfy all the above criteria to be trustworthy and reliable."  Commonwealth v. Patton, 458 Mass. 119, 133 (2010).  
            Here, the judge did not abuse his discretion in determining the troopers' statements identifying the substance as cocaine to be substantially reliable.  Given the applicable burden of proof and other circumstantial evidence, the lack of detail on the State troopers' training and experience in narcotics does not demand a contrary conclusion.  See Figgs v. Boston Hous. Auth., 469 Mass. 354, 364-365 (2014).[13]  As the hearing judge explained, the statements of both troopers concerning the incident were factually detailed, based on their independent personal observations of the "chunky white" substance, and were relayed in the form of police reports and grand jury testimony close in time to the events in question.  See Durling, 407 Mass. at 121, ("[I]t is a crime for police officers to file false reports. . . .  [T]his significantly bolsters the reliability of the reports").  Further, the statements were consistent with each other.  
            Finally, the State troopers' statements concerning the suspected cocaine were also corroborated by other evidence presented at the hearing.  See, e.g., Commonwealth v. Matta, 483 Mass. 357, 336 n.8 (2019).  Aside from the troopers' statements, the Commonwealth also presented a photograph showing a white substance contained in multiple plastic bags placed on a digital scale with a collective weight of thirty-one grams.  Additionally, the circumstances of the seizure are probative as to the illicit nature of the substance.  For example, the substance was found near a bag containing a large quantity of another substance presumed to be heroin -- and which the probationer abruptly threw in the back seat as Molnar approached.  Further, as will be discussed, there was sufficient evidence for the hearing judge to find the probationer possessed a loaded firearm and intended to distribute the substance.  See Commonwealth v. MacDonald, 459 Mass. 148, 153–154 (2011) (proof that substance is drug "may be made by circumstantial evidence," including "behavior characteristic of sales" [quotation and citation omitted]).  
            The probationer also challenges the evidence of his possession or control over the gray backpack containing thirty of the thirty-one grams of cocaine.  In his view, at best, an inference could be made the back seat passenger was in control of the large quantity of cocaine and sold the probationer a small amount consistent with personal use, while there was insufficient evidence the probationer was in control of the larger quantity of cocaine.  We again disagree.  
            There was sufficient, reliable evidence to warrant the judge's finding the probationer controlled the larger quantity of cocaine seized by the State troopers.  First, as the probationer acknowledges, evidence was presented he directly possessed one gram of cocaine, which was found in Brunton's cruiser along with a firearm.  As Molnar testified before the grand jury, this gram of cocaine was packaged similarly to the other thirty grams of cocaine found in the gray backpack.  
            Further, although Molnar observed the gray backpack in the back seat with the other passenger, the driver testified before the grand jury that both the probationer and the other passenger were traveling together to North Adams.  The driver also testified that, when he picked up the probationer and the other passenger, the probationer possessed the green bag that contained much of the suspected heroin.  The suspected heroin found in the green bag was packaged similarly to the cocaine found in the gray backpack.
            Moreover, according to the driver's grand jury testimony, as Molnar was pulling the driver over, the probationer proceeded to take off the green bag and throw it in the back seat next to "his buddy."[14]  Based on these facts, the judge permissibly inferred it was more likely than not that the probationer and the other passenger jointly controlled both bags.  See Commonwealth v. Brzezinski, 405 Mass. 401, 409-410 (1989) (presence, supplemented by other incriminating evidence, may serve to "tip the scale in favor of" control [citation and quotation omitted]).  
            Lastly, the probationer contests the sufficiency of the evidence of his intent to distribute the cocaine.  The probationer asserts the only "distribution" evidence presented at the hearing was Molnar's testimony that, based on his training and experience, the cocaine was packaged for distribution rather than personal use.  The probationer characterizes this testimony as conclusory, in that Molnar failed to explain what training and experience qualified him to conclude the packaging was consistent with distribution and what specific characteristics about the packaging supported this conclusion.
            However, there was other circumstantial evidence from which the hearing judge could permissibly infer the probationer's distributive intent.  See Commonwealth v. Clermy, 421 Mass. 325, 331 (1995) (Commonwealth may introduce circumstantial evidence like cash or drug trade paraphernalia to establish intent to distribute).  For example, Molnar testified the combined weight of the cocaine was thirty-one grams, including packaging, which was corroborated by a photograph of the cocaine on a scale.  See Commonwealth v. Sepheus, 468 Mass. 160, 164 (2014) ("A large amount of cocaine alone can support an inference of an intent to distribute").  Further, although the judge did not make a finding as to whether the tannish powder found in the 1,000 bags was heroin, the quantity of the substance and the way it was packaged supported an inference the substance was an illegal drug packaged for distribution.  See Clermy, supra ("both the quantity of drugs recovered, as well as the manner in which it is packaged, are highly probative of a defendant's plans for its use").  See also Commonwealth v. Myers, 82 Mass. App. Ct. 172, 178 (2012) ("the variety, amount, and packaging of the controlled substances recovered from the defendant permitted the inference that he possessed them for purposes well beyond personal use").  
            Finally, as will be discussed in further detail below, the hearing judge could permissibly find that, at the time of the probationer's arrest, the probationer possessed a loaded, fully functional firearm.  See Commonwealth v. Hines, 449 Mass. 183, 189 (2007), overruled on other grounds by Commonwealth v. Rossetti, 489 Mass. 589, 606 (2022) (offenses concerning trafficking of illegal drugs "frequently involve drug dealers being armed").  In sum, there was sufficient evidence from which the judge could find by a preponderance of the evidence the probationer possessed cocaine with the intent to distribute.  
            c.  Unlawful possession of a firearm.  The probationer next argues that, in proving he unlawfully possessed a firearm, the Commonwealth presented insufficient evidence as to unlawful possession and the operability of the firearm.  See Commonwealth v. Ramsey, 466 Mass. 489, 496-497 (2013).  There was no error.
            First, with respect to unlawful possession of the firearm, "the Commonwealth must prove . . . that the [probationer] in fact failed to comply with the licensure requirements for possessing a firearm."  Commonwealth v. Guardado, 491 Mass. 666, 690 (2023), S.C., 493 Mass. 1, 12 (2023), cert. denied, 144 S. Ct. 2683 (2024).  Here, Molnar testified that a search of the Criminal Justice Information Services database (CJIS) revealed the probationer did not possess a valid license to carry, and that "[t]here was also no record found on CJIS of the firearm."  This evidence alone was sufficient for the probation department to satisfy its burden.  See Commonwealth v. Bookman, 492 Mass. 396, 401 (2023).  See also Guardado, supra at 697-698 (Lowy, J., concurring) ("the absence of an official record, such as the record of a firearms license" may prove defendant failed to comply with licensure requirements).  
            Second, the definition of a firearm requires the weapon be "capable of discharging a shot or bullet."  See Commonwealth v. Housewright, 470 Mass. 665, 679 (2015).  The probationer claims the Commonwealth failed to meet its burden because the only evidence it presented was the State troopers' conclusory statements that the firearm was operable based on their training and experience.  The Commonwealth's evidence of the firearm's operability, however, was not limited to the troopers' opinions.  Other evidence was presented that the seized firearm was loaded with fourteen rounds of ammunition, including one in the chamber.  See Commonwealth v. Muniz, 456 Mass. 166, 171 (2010) (inference of operability may be drawn from fact that firearm was loaded at time of offense).  In addition, the circumstances surrounding the seizure of the firearm further support the inference of operability.  See Commonwealth v. Drapaniotis, 89 Mass. App. Ct. 267, 271 (2016) (operability "may be proved by witness testimony and related circumstantial and corroborative evidence").  
            As discussed above, the judge could have reasonably inferred the probationer intended to distribute the large quantity of controlled substances in his possession; in turn, the judge could have reasonably inferred that the probationer possessed an operable gun to protect himself and the contraband.[15]  See Commonwealth v. Brown, 479 Mass. 600, 608 (2018) (knowledge firearm was loaded can be inferred from circumstantial evidence).  See also United States v. Snow, 462 F.3d 55, 62–63 (2d Cir. 2006), cert. denied, 549 
U.S. 1150 (2007) (firearms found near drug distribution paraphernalia were "readily accessible to protect drugs, drug proceeds, or the drug dealer himself").  Accordingly, there was sufficient evidence for the hearing judge to find that the probationer unlawfully possessed a firearm without a license.  
            2.  Ineffective assistance of counsel.  As in his motion for a new revocation hearing, the probationer continues to press the argument his attorney at the probation revocation hearing was ineffective in failing to move to suppress all evidence stemming from the traffic stop, depriving him of an "an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  More particularly, the probationer contends the traffic stop was pretext for Molnar's racial animus, and any incriminating evidence found during the stop would have been suppressed on equal protection grounds.  
            a.  Standard of review.  In the context of probation violation proceedings, questions of ineffective assistance of counsel "may most appropriately be raised in a motion for a new trial" pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  Patton, 458 Mass. at 129.  Our review of a decision on a motion for a new trial is generally limited to whether the judge's decision constitutes an abuse of discretion or an error of law.  Commonwealth v. Tinsley, 487 Mass. 380, 385 (2021).  

            b.  Applicability of the exclusionary rule.  In denying the probationer's motion for a new revocation hearing, the motion judge relied on Commonwealth v. Olsen, 405 Mass. 491, 491 (1989), to conclude the exclusionary rule does not apply as a matter of course to probation revocation proceedings.  In Olsen, we held that unlawfully obtained evidence is admissible in a probation revocation proceeding, at least where the police "neither knew nor had reason to know of the probationary status of the person whose property was seized,"[16] nor engaged in "egregious" misconduct.  Id. at 491, 496.  The probationer contends that counsel was unconstitutionally ineffective because counsel did not argue that Olsen is limited to violations of the Fourth Amendment to the United States Constitution.[17]  We disagree.  

            In Olsen, 405 Mass. at 493, we held the exclusionary rule does not generally apply to probation revocation proceedings.  We reasoned that, because the purpose of the exclusionary rule is to deter future police misconduct, its remedial objectives are best served by suppressing, at the separate criminal trial, evidence illegally obtained in violation of the probationer's constitutional rights.  See id. at 493-494.  "Exclusion of such evidence from a probation revocation hearing, however, would provide at most only marginal additional deterrence against police misconduct," insufficient to override the State interest that probationers abide by the conditions of their probation.  Id. at 494.  We further noted excluding illegally obtained evidence from probation revocation proceedings might dissuade the use of probation as a remedial tool.  See id. at 496.  Thus, Olsen protects the availability of probation for offenders.  See id.  
            The probationer maintains his counsel was ineffective for not arguing that our decision in Olsen is limited to Fourth Amendment violations.  Yet, the same rationale that drove this court's decision in Olsen arguably counsels its application beyond the Fourth Amendment context.  The exclusionary rule's deterrent effect is best served by suppression in the underlying criminal matter; at most, its application to probation hearings will have a marginal effect.  See Olsen, 405 Mass. at 493-494.  
            Pitted against the exclusionary rule's limited effectiveness in the probation context are the Commonwealth's interests in ensuring a probationer adheres to his probationary conditions and in revoking probation when those terms are violated, as well as the interests of defendants in continued access to probation as a remedial tool.  See id. ("Evidence that a probationer is not complying with the conditions of probation may indicate that he or she has not been rehabilitated and continues to pose a threat to the public" [citation omitted]).  "[T]he State has an overwhelming interest in being able to return an individual to imprisonment without the burden of a new adversary criminal trial[,] if in fact the probationer has failed to abide by the conditions of his or her probation" (citation and alterations omitted).  Id. at 494.  In light of these considerations, we cannot say that counsel's conduct fell below that of an ordinary fallible lawyer.  See Saferian, 366 Mass. at 96.
            Nor can we fault counsel for any failure to argue that the circumstances of the traffic stop here comprised the type of "egregious police misconduct or conduct that 'shock[s] the conscience'" (citations omitted), which we said in Olsen, 405 Mass. at 496, might suffice to allow evidence obtained to be suppressed in connection with a probation violation hearing.  While statistical evidence presented by the probationer supports a conclusion that Molnar's rates of stopping Black and Hispanic drivers outpaced his stopping of white motorists, here -- seemingly against the odds -- he stopped a white driver.  Upon learning the driver was performing a rideshare service, Molnar proceeded to treat him differently from the passengers, who were traveling together and had jointly retained his services.  See DuPont v. Commissioner of Correction, 448 Mass. 389, 400 (2007) ("[d]issimilar treatment of dissimilarly situated persons does not violate equal protection" [citation omitted]).  
            On this record, counsel for the probationer did not perform below that of an ordinary fallible lawyer by failing to file a motion to suppress on equal protection grounds.  See Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977) ("where ineffective assistance of counsel is charged, there ought to be some showing that better work might have accomplished something material for the defense").  
            Conclusion.  We affirm the denial of the probationer's motion for a new hearing and the revocation of probation.  
            So ordered.  
            BUDD, C.J. (concurring).  The court has determined that the circumstances of the traffic stop to which the probationer was subjected do not amount to "egregious police misconduct or conduct that shocks the conscience" (quotation and alteration omitted).  Ante at    , quoting Commonwealth v. Olsen, 405 Mass. 491, 496 (1989).  Thus, according to the court, a motion to suppress evidence collected from the resulting search would have been futile.  See Olsen, supra (absent exceptional circumstances, such as egregious police conduct, probationers may not suppress evidence stemming from searches or seizures in violation of art. 14 of Massachusetts Declaration of Rights at revocation hearings).  On this basis, the court concludes that counsel was not ineffective for failing to file such a motion.  Ante at    .  
            I concur in the court's decision to affirm the denial of the probationer's motion for a new hearing, as well as the judge's decision to revoke probation.  However, I write separately because (1) I believe that the matter can, and should, be resolved on a narrower basis; and (2) I do not necessarily agree with the court's assessment of the additional issues that it reaches.  
            Discussion.  1.  Ineffective assistance claim.  To succeed in obtaining a new probation revocation hearing on the basis of ineffective assistance of counsel, the probationer must demonstrate first that the "behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer" and second that such failing "likely deprived the [probationer] of an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  Because securing a suppression order in the context of a probation revocation proceeding would be without precedent, it cannot be said that the "behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer."  Id.  Thus, the probationer's claim for ineffective assistance must fail.
            In Olsen, 405 Mass. at 493-496, this court held that, as a general rule, probationers may not move to exclude evidence at probation revocation proceedings.  However, the court "expressly [left] open" exceptions for cases involving "egregious police conduct," "conduct that 'shock[s] the conscience,'" "harassment," or an officer's "knowledge of the probationer's status" (citation omitted).  Id. at 496.
            It is the probationer's position that racial discrimination, in violation of the equal protection guarantees of arts. 1 and 10 of the Massachusetts Declaration of Rights, as well as the Fourteenth Amendment to the United States Constitution, amounts to "egregious police conduct" meriting suppression of evidence under Olsen, 405 Mass. at 496.[1]  Moreover, the probationer contends that the trooper's search was motivated by constitutionally impermissible racial discrimination; therefore, had his counsel filed a motion to suppress, it would have been meritorious.[2]
            It is true that to be effective in the constitutional sense, counsel must be proactive and diligent.  See Penson v. Ohio, 488 U.S. 75, 84 (1988) (emphasizing "paramount importance of vigorous representation"); Anders v. California, 386 U.S. 738, 744 (1967) (constitutional requirements "can only be attained where counsel acts in the role of an active advocate [o]n behalf of his client").  However, "[r]easonableness in the context of an ineffective assistance of counsel claim is an objective standard that measures counsel's conduct against that which 'lawyers of ordinary training and skill in the criminal law' would consider competent" (citation omitted).  Commonwealth v. Kolenovic, 471 Mass. 664, 674 (2015), S.C., 478 Mass. 189 (2017).             Since Olsen was decided, this court has been clear that outside of a few delineated exceptions, including where there has been "egregious police conduct," the exclusionary rule does not apply in probation revocation proceedings.  See, e.g., Commonwealth v. Rainey, 491 Mass. 632, 638 & n.14 (2023); Commonwealth v. Wilcox, 446 Mass. 61, 66 (2006).  We have yet to address the meaning of "egregious" in this context.  Moreover, to our knowledge, a motion to suppress evidence within a probation revocation hearing has yet to be granted in the Commonwealth.
            For these reasons, it is not surprising that counsel proceeded as if a motion to suppress were not an option -— it appeared as though settled law foreclosed a motion to suppress within the context of a probation hearing.[3]
            Where, as here, counsel failed to press a claim that never before has been successful, the possibility of which may elude a reasonable practitioner, his conduct did not fall measurably below that which "might be expected from an ordinary fallible lawyer."  Saferian, 366 Mass. at 96.  A "reasonably competent attorney" is expected "to file any motions to suppress evidence reasonably likely to succeed."  Commonwealth v. Alcide, 472 Mass. 150, 160 (2015).  Nevertheless, the constitutional guarantee of effective assistance "does not insure that defense counsel will recognize and raise every conceivable constitutional claim."  Engle v. Isaac, 456 U.S. 107, 134 (1982).  See Smith v. Robbins, 528 U.S. 259, 288 (2000) ("counsel . . . need not [and should not] raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); Smith v. Murray, 477 U.S. 527, 535 (1986), quoting Murray v. Carrier, 477 U.S. 478, 486-487 (1986) (counsel's "fail[ure] to recognize the factual or legal basis for a claim" does not necessarily amount to "error of such magnitude that it rendered counsel's performance constitutionally deficient").  Compare Commonwealth v. Boria, 460 Mass. 249, 253 (2011) (no ineffective assistance where counsel failed to press claim because that "claim would have been futile at the time her appeal was brought in," even if counsel could have attempted "to seek a change in the law"), with Commonwealth v. Denehy, 466 Mass. 723, 728-729 (2014) (ineffective assistance where "trial counsel unreasonably relinquished [meritorious] claim").
            In these circumstances, I would affirm the denial of the probationer's claim on the basis that counsel did not provide ineffective assistance in failing to file a motion to suppress.[4]
            2.  Additional issues.  Despite the question on appeal having a relatively straightforward resolution, the court weighs in on a number of additional issues.  Specifically, the court comments on (1) possible interpretations of Olsen, 405 Mass. at 493-495; (2) the exceptions articulated therein; and (3) the merits of the probationer's underlying discrimination claim.  See ante at    .  In my view, even though the probationer raised arguments touching on these issues, they need not, nor should they, be reached.  See Commonwealth v. Bartlett, 374 Mass. 744, 749 (1978) ("A court will ordinarily not pass upon a constitutional question [even if] properly presented by the record, if there is also present some other ground upon which the case may be disposed of" [quotation and citation omitted]); First Nat'l Bank of Boston v. Attorney Gen., 362 Mass. 570, 595-597 (1972) (Quirico, J., concurring), and cases cited (concurring on statutory grounds and "avoid[ing] the strong temptation to engage in a discussion of [an] interesting constitutional question . . . because it is unnecessary to do so").  Having done so, though, the court's brief analysis raises more questions than it purports to answer.
            First, in answer to the probationer's contention that Olsen's holding was limited to art. 14 violations, the court summarily concludes that Olsen applies to all constitutional violations.  Ante at    .  Although this interpretation is perhaps reasonable, it is far from inevitable.  In reaching that conclusion, the court fails to address the fact that Olsen predated Commonwealth v. Lora, 451 Mass. 425 (2008), the case in which we held that "evidence seized in the course of a stop violative of equal protection should, ordinarily, be excluded at trial."  Id. at 426.
             The court also does not engage sufficiently with the probationer's argument that evidence stemming from racial discrimination should, notwithstanding Olsen, be treated distinctly from evidence stemming from unreasonable searches or seizures and that the former should possibly be suppressed in probation revocation proceedings.  Such a recognition from this court would comport with decisions in which we and the United States Supreme Court have concluded that the realization of equal protection guarantees requires exceptional considerations.  See, e.g., Commonwealth v. McCalop, 485 Mass. 790, 798-799 (2020), quoting Peña-Rodriguez v. Colorado, 580 U.S. 206, 221, 224 (2017) (adopting exception to "no-impeachment rule" enabling courts to inquire into juror prejudice, because racial bias "implicate[s] unique historical, constitutional, and institutional concerns"); Commonwealth v. Long, 485 Mass. 711, 716 (2020) (establishing more accessible remedy in consideration of "way facially neutral laws actually are enforced"). 
            Moreover, several other presumptions underpinning the court's rationale lack clear support.  To begin, the court states without elaboration that suppression would only produce a "marginal [deterrence] effect."[5]  Ante at   .  The court also asserts that its decision protects the availability of probation without considering that other jurisdictions have adopted and implemented alternative approaches to suppression while providing heightened protections to probationers, without damaging that institution's availability.[6]  See id. at     (discussing importance of maintaining "availability of probation for offenders").  
            Second, the court suggests that the record below does not constitute "egregious police misconduct" nor "shock[] the conscience."[7]  Ante at    .  Not only does the court base this conclusion on a limited record,[8] but it also fails to provide a definition or any other guidance as to what constitutes such egregious police conduct for the purposes of the Olsen rule.  Id. at    .  Notably left unanswered is the critical question when, if ever, racial discrimination may amount to egregious police conduct.[9]  
            The court's silence on this question, along with its repeated suggestion that the trooper behaved reasonably and was not motivated by bias, see ante at    , is particularly troubling where, as here, the probationer's motion raises a reasonable inference of racial discrimination.[10]  Specifically, the probationer's motion for a new hearing meticulously detailed how implicit bias may have influenced the decisions the trooper made at each stage of the interaction, including the decisions to do the following:  break with State police policy directing troopers to request documents "related" to a stop by demanding identification from the Black passengers, after the vehicle had been pulled over for reckless driving; interpret the back seat passenger's nervousness, lack of identification, and slight movements as sufficiently suspicious and indicative of danger to warrant removing, pat frisking, and detaining him;[11] search small compartments of and containers within a backpack, none of which appeared as if it could hold a firearm;[12] and assume the Black front seat passenger's culpability and association with the narcotics uncovered in his search, while crediting the white driver's attempts to dissociate himself from the passengers and the bags in the vehicle.  Despite these allegations, which are confirmed by video recordings of the stop and complemented by statistical evidence that the trooper stopped drivers of color at a disproportionately high rate, the court implies that the trooper exhibited nothing but professionalism in his search and was guided only by race-neutral considerations.  See id. at    .  
            The court's minimization of the probationer's equal protection claim and vagueness with respect to how racial discrimination claims might interact with Olsen invite obvious questions, including whether constitutionally impermissible racial discrimination ever amounts to egregious police conduct and, if so, when does biased policing become "egregious."  The commentary the court does provide on the issue does not offer sufficient guidance on these key doctrinal questions.  It also regrettably diminishes the probationer's claim of biased policing.
            Conclusion.  Rather than remaining focused on the question presented, the court unnecessarily issues a sweeping decision that touches on issues ranging from the purpose of the exclusionary rule to the reasonableness of the trooper's conduct.  In the process, the court narrows several different protections afforded to those subject to the Commonwealth's criminal jurisdiction, including the constitutional right to be free from racial discrimination and the potential right to suppress certain evidence at probation revocation proceedings.  In my view, this case is not the best vehicle for considering each issue.  Our common law, and the Commonwealth, would be better served by our reserving judgment on those questions for another day.
 
footnotes

 
            [1] The probationer also challenges the sufficiency of the evidence that he committed noncriminal probation violations by failing to appear for drug screenings and failing to pay probation supervision fees.  
            [2] We acknowledge the amicus briefs submitted by the Criminal Justice Institute at Harvard Law School and the Massachusetts Association of Criminal Defense Lawyers; and the Committee for Public Counsel Services, NAACP Legal Defense & Educational Fund, Inc., and the American Civil Liberties Union of Massachusetts, Inc.  We also acknowledge the amicus letter submitted by the Boston Bar Association.  
            [3] The probationer also pleaded guilty to assault and battery, G. L. c. 265, § 13A (a); assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (b); assault and battery by means of a dangerous weapon resulting in serious bodily injury, G. L. c. 265, § 15A (c) (i); and breaking and entering at night, G. L. c. 266, § 16.  
            [4] At the hearing, the probation department did not produce any percipient witnesses in support of the alleged new criminal violations.  Rather, the probation department introduced various exhibits, including grand jury minutes, arrest reports, photographs, and video footage of the traffic stop that was taken from the dashboard camera and body camera of the trooper who initiated the stop.  The probation officer also testified at the hearing.  
            [5] Various portions of this case were impounded.  The impoundment is lifted as to the information in the opinion, to the extent necessary in resolving the case.  See Commonwealth v. Stevenson, 474 Mass. 372, 373 n.1 (2016).  
            [6] Molnar later described this green bag as being a "military style" bag.
            [7] The driver later described "hood Uber" as "a Facebook group where people [request] rides when they need to get around the city or wherever they need to go, and [then you] charge them and get paid."  
            [8] The driver would later testify that the probationer had asked him to tell the police that he "knew [the probationer] from college" before Molnar had approached the vehicle.  
            [9] The defendant was also charged with possession of a large capacity firearm during the commission of a felony, G. L. c. 265, § 18B; unlawful possession of a large capacity firearm, G. L. c. 269, § 10 (m); unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n); unlawful possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h) (1); trafficking in cocaine, G. L. c. 94C, § 32E (b) (1); and trafficking in heroin, G. L. c. 94C, § 32E (c) (1).  
            [10] The new offenses listed in the notice mirrored the criminal charges for which the probationer was arraigned in the Holyoke District Court.  
            [11] The probationer also submitted two statistical reports written by Roland B. Stark, a statistician and research consultant.  In one report, Stark analyzed the likelihood that a Black driver, as compared to a white driver, would be searched during a traffic stop while on probation in Massachusetts.  In the other report, Stark examined data on approximately 1,000 stops by Molnar and concluded that the trooper "selected drivers in a way that very likely over-represented" Black drivers when compared to white drivers.  However, the data does not account for the race of occupants -- and here, the driver was white.  Additionally, beyond the data on initial stops, Stark expressly acknowledged that data on Molnar's subsequent warnings, citations, and arrests "showed no consistent bias against any racial group."  
            [12] The judge also found the probationer violated noncriminal conditions of his probation by failing to attend drug screenings and failing to pay supervision fees.  To prove these violations, the Commonwealth relied on several documents, such as a financial case summary demonstrating the probationer's arrearage.  Although the probationer did not object at the hearing, he now argues the documents are unreliable hearsay and insufficient to show he committed these violations.  However, in deciding to revoke probation, the judge focused entirely on the probationer's criminal record and criminal probation violations.  Accordingly, the noncriminal violations did not "drive the result" and the judge's reliance on the disputed documents is not reversible error.  Commonwealth v. Rainey, 491 Mass. 632, 648-649 (2023).
            [13] In arguing the trooper's statements were insufficient, the probationer cites cases concerning criminal prosecutions where the statements at issue were scrutinized under the "beyond a reasonable doubt" standard of proof.  See, e.g., Commonwealth v. MacDonald, 459 Mass. 148, 154 (2011), quoting Commonwealth v. Dawson, 399 Mass. 465, 467 (1987) ("it would be a rare case in which a witness's statement that a particular substance looked like a controlled substance would alone be sufficient to support a conviction").  They are thus inapposite here, where the judge "need find only by a preponderance of the evidence that a violation has occurred."  Commonwealth v. Joyner, 467 Mass. 176, 190 (2014).
            [14] The hearing judge concluded the driver's statements given to the grand jury were substantially reliable, reasoning that the driver was a "disinterested witness," whose testimony was detailed, given under oath, based on direct observations, and consistent with his earlier statements that were taken by the police and made close in time to the driver's observations.  The judge did not abuse his discretion in so concluding.  See Hartfield, 474 Mass. at 484.
            [15] We note that a general inference drug dealers are more likely to possess an operable firearm is too broad in circumstances where there is no direct evidence of the defendant handling the gun or threatening to use it.  See Commonwealth v. Ashford, 486 Mass. 450, 455 (2020).  Here, however, Brunton discovered the firearm in the cage area where the probationer was seated earlier.  Moreover, the firearm was loaded with fourteen rounds of ammunition, including one in the chamber.
            [16] There was no evidence presented in this case that Molnar knew or had reason to know of the probationer's probationary status.  
            [17] In the alternative, the probationer urges us to overturn Olsen.  We decline to do so.  First, the probationer contends there is a critical factual assumption underlying Olsen that is no longer true:  at the time Olsen was decided, officers were not likely to know a person's probationary status prior to a search or seizure, whereas now, thanks to updates in technology, "police can effortlessly obtain probation records."  However, the mere fact that probation records may be easier to obtain today than at the time Olsen was decided does not compel the conclusion that every officer with access to modern technology has either constructive or actual knowledge of a person's probationary status.  See Olsen, 405 Mass. at 496.  
            The probationer next argues that Olsen was wrongly decided because it disparately impacts Black persons, who are significantly more likely than white persons to be on probation, stopped by law enforcement officers, and searched.  "[A] neutral law or official act or practice that 'has a disproportionately adverse effect upon a racial minority' is unconstitutional 'only if that impact can be traced to a discriminatory purpose.'"  Commonwealth v. Grier, 490 Mass. 455, 469 (2022), quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272 (1979).  The probationer provides no evidence of any discriminatory purpose.
 
footnotes for concurring

 
            [1] In the alternative, the probationer contends that the limitation that Olsen places on motions to suppress in probation revocation hearings applies only to motions based on unreasonable searches and seizures in violation of art. 14 and the Fourth Amendment to the United States Constitution, in which case his equal protection claim would fall outside of the Olsen rule.
            [2] The probationer argues further that a motion to suppress evidence stemming from a racially discriminatory search in connection with a probation violation hearing should be analyzed just as a defendant's motion to suppress would be within a criminal case-in-chief -- specifically, according to the burden-shifting framework established in Commonwealth v. Long, 485 Mass. 711, 724-725 (2020).  As discussed infra, we need not reach the question whether the Long analysis applies to probation revocation hearings.
            [3] The court suggests that counsel decided not to file a motion to suppress because counsel concluded that State police Trooper Bryce Molnar's conduct did not constitute egregious police conduct.  See ante at     ("Nor can we fault counsel for any failure to argue that the circumstances of the traffic stop here comprised the type of egregious police misconduct" that "might suffice" to allow for suppression [quotation and citation omitted]).  However, that does not appear to be an accurate account.  Indeed, despite counsel's stated belief that suppression was not an available remedy, he nevertheless attempted to advocate on behalf of his client by expressing his concern regarding the trooper's treatment of the vehicle's two Black passengers.
            [4] Notably, this is not a case in which counsel "relaxed his partisan instinct."  Smith, 528 U.S. at 294 (Souter, J., dissenting).  Although counsel reasonably believed suppression was not an available remedy, counsel tried to advocate forcefully for his client on this very issue in other ways.  For instance, counsel asserted he was, and the Superior Court also should be, "deeply troubled by the way that the two African American passengers in the car were treated differently from the driver."  See, e.g., Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983) (no deficient performance where counsel tried highlighting issue in cross-examination, rather than through motion with low likelihood of success); Commonwealth v. Levia, 385 Mass. 345, 353-354 (1982) (same).
            [5] The court fails to consider evidence suggesting that law enforcement regularly leverages its heightened access to data on probationers, who have a diminished expectation of privacy, to spearhead investigations or enforcement campaigns unrelated to the terms of probation.  See, e.g., Commonwealth v. Roderick, 490 Mass. 669, 682 (2022) (acknowledging Commonwealth has interest in subjecting probationers convicted of severe crimes to global positioning system [GPS] monitoring to "investigat[e] future . . . offenses"); Commonwealth v. Johnson, 481 Mass. 710, 716, cert. denied, 140 S. Ct. 247 (2019) ("law enforcement's use of a probationer's GPS location data for investigatory purposes" does not constitute search in constitutional sense as probationers have "no reasonable expectation of privacy in this data").  See also, e.g., Commonwealth v. Marchant, 52 Mass. App. Ct. 1109 (2001) (unpublished summary disposition describing "Operation Night Lights," where "probation officer[s] would go out in the evening, along with local police, and conduct home visits on probationers").  See generally Matz & Kim, Policy Implications of Police-Probation/Parole Partnerships:  A Review of the Empirical Literature, 77 Fed. Probation 9, 11-12 (2013) ("officers may use probation's legitimate access to a probationer's residence as a means to harass probationers and conduct illegal searches . . . at odds with a probationer's fourth amendment protections"); Murphy & Lutze, Police-Probation Partnerships:  Professional Identity and the Sharing of Coercive Power, 37 J. Crim. Just. 65, 71, 73 (2009) (reporting evidence from empirical study that some police view revocation as means to facilitate "removing problem offenders from the neighborhood"); Murphy & Worrall, The Threat of Mission Distortion in Police-Probation Partnerships, 30 Policing:  Int'l J. Police Strat. & Mgmt. 132, 141-144 (2007) (reporting empirical findings that police leverage probation officers' status and information to circumvent privacy protections).  Despite the rise of partnerships between law enforcement and probation services, the court does not explain why revoking law enforcement's ability to utilize such tools in egregious cases involving unconstitutional discrimination or blatant art. 14 violations would not deter police misconduct.  Cf. Long, 485 Mass. at 718-719 (discussing suppression as means to address "urgent need to deter discriminatory policing").  
            [6] Several States have held that the exclusionary rule always applies to probation revocation proceedings.  See, e.g., State v. Scarlet, 800 So. 2d 220, 221-222 (Fla. 2001), cert. denied, 535 U.S. 922 (2002), citing Grubbs v. State, 373 So. 2d 905, 909 (Fla. 1979); State v. Marquart, 123 N.M. 809, 812-813 (Ct. App.), cert. denied, 123 N.M. 626 (1997); State ex rel. Juvenile Dep't of Multnomah County v. Rogers, 314 Or. 114, 120 (1992).  
            Additionally, nearly twenty States and several United States Courts of Appeals have, similar to this court, acknowledged that a safety valve allowing probationers to suppress evidence stemming from egregious conduct or targeting of probationers may be necessary.  See, e.g., United States v. Farmer, 512 F.2d 160, 162 (6th Cir.), cert. denied, 423 U.S. 987 (1975) (exclusion rule applies in cases involving "harassment by the police"); In re Martinez, 1 Cal. 3d 641, 650-651, cert. denied, 400 U.S. 851 (1970) (same where "police conduct in effectuating the search was so egregious as to offend the . . . conscience of our people" [quotations and citation omitted]); Chase v. State, 309 Md. 224, 253 (1987) (rule applies where officer acts "in bad faith").  Appellate courts in some of those jurisdictions have decided cases within this intricate framework, occasionally granting suppression for probationers and candidly elucidating when, if ever, suppression may become available.  See, e.g., Joubert v. State, 926 P.2d 1191, 1195 (Alaska Ct. App. 1996), quoting State v. Sears, 553 P.2d 907, 912-913 (Alaska 1976) (suppressing evidence because "contested search or seizure was 'consciously directed' toward a probationer"); People v. Ressin, 620 P.2d 717, 720-721 (Colo. 1980) (denying suppression because probationer proffered "no evidence of police harassment or of a willful disregard of constitutional standards of arrest and search," while further defining standard for application of exclusionary rule); People v. Holliday, 318 Ill. App. 3d 106, 114-115 (2001) (suppressing evidence because probationer made sufficient showing of "police harassment").
            [7] The court goes on to reason that because, in its view, the officer's behavior clearly did not fall within one of the delineated exceptions to the Olsen rule, counsel was not ineffective as he had no reason to move to suppress evidence.  
            [8] The arresting trooper never was cross-examined in this proceeding as to his motivations and potential for bias in conducting the search.  Notably, a different judge, who heard testimony from the trooper regarding the same stop for purposes of the related criminal matter, concluded based on the trooper's inconsistent testimony and other evidence that the trooper was acting on a hunch rather than on reasonable suspicion.  
            [9] Balanced against the principle of constitutional avoidance is the notion that it is incumbent on the judiciary to interpret the law in a manner that provides guidance to the lower courts and litigants.  See Jenkins v. Chief Justice of the Dist. Court Dep't, 416 Mass. 221, 238 (1993), quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.  Those who apply the rule to particular cases, must of necessity expound and interpret that rule").  Where the court has decided to reach issues on which the rights of many depend, it should, in the least, impart a standard clear enough to allow lower courts and litigants to understand the court's holding. 
            [10] Were we to reach and analyze the merits of the probationer's claim under the Long framework, the movant's "initial burden" to "establish a reasonable inference" of discrimination is not high.  See Long, 485 Mass. at 712, 723-724 ("Conclusive evidence is not needed").  Thereafter, a movant is entitled to an evidentiary hearing, at which the burden shifts to the Commonwealth to rebut the movant's showing of discrimination.  Id. at 713. 
            [11] See Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007) ("nervous or furtive movements do not supply reasonable suspicion when considered in isolation").  See also Commonwealth v. Torres, 424 Mass. 153, 161 (1997) ("Adding up eight innocuous observations -- eight zeros -- does not produce a sum of suspicion that justifies a line of interrogation, an order of persons out of their car, and a search of their car").  
            [12] See Commonwealth v. Almeida, 373 Mass. 266, 272 (1977), S.C., 381 Mass. 420 (1980) (protective patfrisk searches must be "confined to what is minimally necessary to learn whether the suspect is armed").  See, e.g., Commonwealth v. Stuart, 469 Mass. 257, 261 (2014) ("reasonable suspicion alone was not sufficient to allow [the officer] lawfully to open the hard cigarette box, where there was nothing to suggest that a weapon was inside").